# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KOMAA MNYOFU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 8717 |
| | ) | |
| BOARD OF EDUCATION OF RICH TOWNSHIP HIGH SCHOOL DISTRICT 227, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the court is defendants' motion to dismiss. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

*Pro se* plaintiff Komaa Mnyofu has brought this 42 U.S.C. § 1983 action against the Board of Education of Rich Township High School District 227 (the "Board"), Board Superintendent Brian Knutson, Assistant Board Superintendent Larry Tandy, Board President Edwin Burnette, Rich Central High School ("Rich Central") Principal Selma McDonald, Rich Central Assistant Principal Roseanne Williamson, Rich Central Dean of Students Helga Spoolstra, Rich Central Social Worker Viola Baecher, Rich Central Nurse Diane Kolosh (collectively, the "Rich Township defendants"), and Mnyofu's ex-wife Janice Taylor. The complaint alleges violations of

Mnyofu's Fourteenth Amendment right in the "care, custody and control" of his child and his First Amendment right of free speech.

The following facts, drawn from the complaint, are taken as true for purposes of this motion. Mnyofu and Taylor have a son, Shamari Jones, who in 2002 was a student at Rich Central in Olympia Fields, Illinois. Mnyofu has had sole legal custody of Shamari since October 2000. Beginning in August 2002, in an effort to get custody transferred to Taylor, she and several Rich Township defendants agreed to fabricate allegations that Mnyofu was physically abusing Shamari. To manufacture a record, Taylor, on both September 5 and October 2, 2002, telephoned the Country Club Hills, Illinois police department to report "domestic disturbances" at Mnyofu's residence where Shamari was living. Officers were dispatched to Mnyofu's home on both occasions, but no police report was filed regarding any abuse. One of the officer's "shift summary" logs from September 5 reads:

> R/P Janice Taylor called this PD and explained that her son Shamari J. Jones M/B 032286 called her and advised that his father whom he is staying with is being verbally abusive towards him. R/O at this time went to the father's home 18720 Lee and spoke to subject Komaa Mnyofu M/B 073157 who advises that he has court custody of their son and that his son became angry, and called his mother when he was told to clean up his room. R/O observed no injuries or any signs of a physical altercation between father and son.

(Compl., ¶ 23.)

In another attempt to substantiate her allegations of abuse, Taylor, on October 4, 2002, telephoned Baecher, a social worker at Rich Central. Taylor summarized the conversation in a journal entry:

> 10/4/02 (Friday AM) Called Rich Central and spoke with social worker Baecher and explained the two incidents (September 5 & October 2, 2002) that had happened. I wanted her to speak to Shamari to verify what had happened and document it. Also to speak with TF North High School about Shamari attending there if I got custody back.

(Id., ¶ 25.) Taylor also had conversations in October 2002 with Rich Central Assistant Principal Williamson regarding whether Shamari could still attend Rich Central if he lived with Taylor (who presumably lived outside the school district).

Two months later, on the morning of December 3, Baecher and Rich Central nurse Kolosh, with Taylor present, telephoned the Illinois Department of Children and Family Services ("DCFS") from Baecher's office to falsely report evidence of alleged abuse. They claimed to have observed "scratches" on Shamari's neck, and Baecher, in a later written report, claimed to have learned that Shamari told a fellow student that "his father had beaten him." (Id., ¶ 51.) Later that day, Shamari was taken to the Country Club Hills police station where police officers, a DCFS investigator, Taylor and Beacher "coached" him to give statements of alleged abuse. One of the officers then told Shamari that he

could not return to his father's home because he (Mnyofu) "had been arrested . . . and was . . . in jail." (Id., ¶ 55.) This was a lie told to Shamari to explain why he had to go home with Taylor. Taylor would retain physical custody of Shamari until his emancipation in March 2004.

On December 9, 2002, based on Taylor's and Baecher's allegations, Mnyofu was charged with criminal domestic battery. A bench trial was held, and Mnyofu was found not guilty. Meanwhile, the DCFS conducted an investigation and concluded that the allegations of abuse were "founded."

From December 4 through December 19, 2002, while in Taylor's custody, Shamari did not attend school. Baecher visited Taylor's home several times during that period to deliver school work for Shamari. Mnyofu obtained a court order on December 13 that commanded Taylor to "immediately re-enroll Shamari Jones in Rich Central." (Id., ¶ 29.) Taylor did not comply, and was aided by Rich Township defendants (unnamed) who issued "excused absences" for Shamari. Taylor returned Shamari to Rich Central only after she received a second court order threatening incarceration.

Mnyofu also learned that Baecher had been "treating" Shamari for "mental concerns," so he requested an explanation at a December 2002 Board meeting as to why Rich Township employees were meeting with Shamari and Taylor, the non-custodial parent, without his knowledge or consent. At the February 2003 Board meeting,

Assistant Board Superintendent Tandy provided Mnyofu with a written explanation which, according to Mnyofu, "revealed that [Rich Township defendants] were . . . engaged in a 'cover-up' to hide their actions from [Mnyofu] of working in concert with Defendant Taylor to trample on [his] legal custodial rights." (Id., ¶ 42.)

Mnyofu also spoke out at Board meetings from August 2002 through April 2003, and in the local press, about Board Superintendent Knutson's "authorization of 'homosexual safe zones designated by rainbow triangles displayed on school buildings without Board approval" (id., ¶¶ 67, 76), as well as the Board's "budget deficit, lack of contracts to black businesses, [the] District's academic failure of majority Black students, . . . lack of leadership and an array of public policy concerns." (Id., ¶ 68.)

Knutson, Tandy, Rich Central Principal McDonald, Baecher, Kolosh and Taylor plotted to smear Mnyofu's name in retaliation for his complaints. Specifically, "Knutson directed Burnette to silence and censure [Mnyofu] during the recognition of citizen's portion of the board's agenda" at Board meetings by "interrupting [him] while speaking, allowing others supportive of the rainbow triangles to interrupt, boo, hiss and verbally attack [him]; [and] threatening to remove [him] for 'disorderly conduct.'" (Id., ¶ 79.) Knutson also "directed McDonald to have large numbers of law enforcement officers present at Board meetings. McDonald could be

seen visibly pointing [Mnyofu] out to law enforcement officers. This act, intended to intimidate [Mnyofu] from speaking, made it appear to those present that [he] posed some 'threat' to the public safety." (Id., ¶ 81.) Finally, the Board instituted a new policy whereby citizens wishing to speak at Board meetings were first required to write their name, address and question or comment on an index card.

Other acts of retaliation included sending a letter to Mnyofu from Rich Central barring him from the school "for any reason" under threat of arrest and prosecution; posting a "wanted picture" of Mnyofu throughout Rich Central; giving false statements to the DCFS during its investigation; spreading false rumors regarding the DCFS investigation and the domestic battery case; sending copies of police reports and witness statements from the battery case to "members of the community"; and punishing Shamari by suspending him during the 2002-2003 school year for an alleged infraction that occurred the previous year. (Id., ¶¶ 57, 68.)

Finally, on April 21, 2003, at the suggestion of his counsel in the battery case, Mnyofu went to the Board's offices to deliver to Knutson a copy of the not guilty verdict. McDonald saw Mnyofu approaching and alerted security who, along with McDonald, followed Mnyofu to Knutson's office. Mnyofu asked Knutson to "call off" McDonald. In explaining to Mnyofu why she and security had followed him, McDonald stated "You're not a parent in this

District anymore." (Id., ¶ 86.)

On these alleged facts, Mnyofu has brought a seven-count complaint from which we glean the following claims: Fourteenth Amendment claims for deprivation of Mnyofu's right in the "care, custody and control" of his child against the Board, Tandy, Baecher, Kolosh and Taylor (Counts I and II), and conspiracy to do the same against Williams, Baecher, Kolosh and Taylor (Count III); First Amendment claims for retaliation against the Board, Knutson, Burnette and McDonald (Count V) and for conspiracy to retaliate against the Board, Knutson, Tandy, McDonald, Baecher, Kolosh and Taylor (Count IV); a state law claim for intentional infliction of emotional distress against all defendants (Count VI); and a claim seeking declaratory relief from a DCFS ruling and a Circuit Court of Cook County order (Count VII). Mnyofu seeks compensatory and punitive damages, and an injunction against "further actions designed to intimidate, harass, and to prevent [Mnyofu] from free movement on District property."[1]

The Rich Township defendants have filed a joint motion to dismiss for failure to state a claim. Taylor has filed an answer.

### DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test

---

[1] Mnyofu also seeks attorney's fees under 42 U.S.C. § 1988. The Supreme Court has made clear, however, that pro se litigants are not entitled to fee awards under § 1988. See Kay v. Ehrler, 499 U.S. 432, 438 (1991).

the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Hentosh v. Herman M. Finch Univ. of Health Sciences, 167 F.3d 1170, 1173 (7th Cir. 1999); Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997). Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); Jones v. General Elec. Co., 87 F.3d 209, 211 (7th Cir.), cert. denied, 519 U.S. 1008 (1996).

Moreover, the court has a special responsibility to construe a *pro se* complaint liberally and to "take appropriate measures to permit the adjudication of *pro se* claims on the merits, rather than to order their dismissal on technical grounds." Donald v. Cook County Sheriff's Dep't, 95 F.3d 548, 555 (7th Cir. 1996); see also Castillo v. Cook County Mail Room Dep't, 990 F.2d 304, 307 (7th Cir. 1993) (a *pro se* complaint, "however inartfully pleaded," should be liberally construed). Accordingly, when reviewing a *pro se* complaint, the court must employ standards less stringent than if the complaint had been drafted by counsel. Antonelli v.

Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1996); Curtis v. Bembenek, 48 F.3d 281, 283 (7th Cir. 1995) (both citing Haines v. Kerner, 404 U.S. 519, 520 (1972)).

We first take up Mnyofu's claims that defendants deprived him, or conspired to deprive him, of his constitutional interest in the upbringing of his child. The Fourteenth Amendment's Due Process Clause guarantees more than fair process; it includes a substantive component that "provides heightened protection against governmental interference with certain fundamental rights and liberty interests." See Washington v. Glucksberg, 521 U.S. 702, 719 (1997). The Supreme Court has long recognized a fundamental liberty interest in the "care, custody and control" of one's children, which includes the right to "establish a home and bring up children" and "to control the education of their own." Troxel v. Granville, 530 U.S. 57, 65 (2000) (quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923)); see also Santosky v. Kramer, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody and management of their child"). Mnyofu claims that this right was violated when defendants conspired to, and did, cause Shamari to be taken from his custody by making false allegations of child abuse.

Defendants argue that the claims are untimely. We agree. Section 1983 claims arising in Illinois are governed by a two-year limitations period. See Licari v. City of Chicago, 298 F.3d 664,

667-68 (7th Cir. 2002).[2] The statute of limitations clock begins to run, or a claim accrues, "when all its elements have come into existence." Cathedral of Joy v. Vill. of Hazel Crest, 22 F.3d 713, 717 (7th Cir. 1994). Since "every constitutional tort actionable under § 1983 is treated as a personal injury, . . . the claim [accrues] when the injury is inflicted." Diaz v. Shallbetter, 984 F.2d 850, 855 (7th Cir. 1993). Mnyofu's injury occurred, and therefore his claims accrued, on December 3, 2002, the date that Taylor took over physical custody of Shamari following defendants' allegations of abuse. On that date, Mnyofu's interest in the care of his child was significantly disrupted; he lost custody (actual, if not legal) of his son. Mnyofu's Fourteenth Amendment claims, filed on March 16, 2005, were untimely by over three months. Accordingly, Counts I, II and III are dismissed.

We now address Mnyofu's claims that defendants violated his First Amendment rights by retaliating, and conspiring to retaliate, against him for speaking out on Board employees' unauthorized contact with his son and on various Board policies. Evaluation of Mnyofu's retaliation claims involves a three-step inquiry. First, we must determine whether Mnyofu's speech was

---

[2]Section 1983 does not provide its own statute of limitations. The Supreme Court, in Wilson v. Garcia, 471 U.S. 261, 276-80(1985), filled that legislative gap by directing district courts to look to the personal injury laws of the state where the injury occurred to determine the applicable limitations period. Illinois's personal injury statute of limitations is two years. See 735 ILCS § 5/13-202.

constitutionally protected. Second, we must evaluate whether defendants' actions were motivated by Mnyofu's constitutionally protected speech. Finally, if Mnyofu can establish that his speech was a motivating factor in defendants' actions, we must assess whether defendants would have taken the same action irrespective of his First Amendment rights. <u>Kokinnis v. Ivkovich</u>, 185 F.3d 840, 843 (7th Cir. 1999); <u>see also</u> <u>Landstrom v. Illinois Dept. of Child & Fam. Svcs.</u>, 699 F.Supp. 1270, 1278 & n. 17 (N.D. Ill. 1988) (analysis used to evaluate First Amendment retaliation claim by public employee applies equally to private individual's retaliation claim).

Defendants first contend that Mnyofu's complaints regarding Board employees' meetings with his son were not constitutionally protected. To fall under the cloak of the First Amendment, expression must "touch upon a matter of public concern," a requirement satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern of the community, rather than merely a personal grievance. See <u>Connick v. Meyers</u>, 461 U.S. 138, 146-48 (1983). Whether statements address a matter of public concern is a question of law, and "depends upon content, form and context." <u>Landstrom v. Illinois Dept. of Children & Family Svcs.</u>, 892 F.2d 670, 678-79 (7th Cir. 1990). Mnyofu requested an explanation as to why Board employees were "treating" and meeting with Shamari without his permission.

Although his complaint was voiced at a public meeting, it addressed only *his* parental rights, and did not implicate defendants' conduct with respect to anyone else. His purpose was not to "alter public opinion," Crowley v. McKinney, 400 F.3d 965, 973 (7th Cir. 2005) or to "bring wrongdoing to light," Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir. 1985), but simply to resolve a personal complaint. Therefore, Mnyofu's statements regarding the employees' contact with Shamari fail as a matter of law to relate to a matter of public concern and cannot support a First Amendment claim. Defendants do not dispute that the remainder of Mnyofu's criticisms related to matters of public concern.

Defendants' next argument is that the intracorporate conspiracy doctrine defeats Mnyofu's First Amendment conspiracy claim. Under the intracorporate conspiracy doctrine, "a conspiracy cannot exist solely between members of the same entity" *if* the allegedly unlawful acts are within the scope of employment. Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 632 (7th Cir. 1999). This argument goes nowhere. Defendants assert that since they are all employed by Rich Township, there can be no conspiracy. But defendants fail to address the doctrine's all-important "scope of employment" qualification. More fundamental, the complaint alleges that Taylor, a non-Rich Township employee, was a co-conspirator. (See Compl., ¶ 83.) Although that allegation is not where it should be - it is pled under the

retaliation count instead of the conspiracy count – it is in the complaint, and under the more relaxed standard of review accorded *pro se* filings, it is well-pleaded. The intracorporate conspiracy doctrine does not apply.

Defendants' final argument on the First Amendment claims is that they are entitled to qualified immunity. Government employees performing discretionary functions are entitled to qualified immunity from liability arising out of conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The question, then, is whether it was "clearly established" that a public school employee could not retaliate against Mnyofu in the manner alleged for his constitutionally protected expression. Put another way, was it reasonable for defendants to believe that they could retaliate against Mnyofu? See Nabozny v. Podlesny, 92 F.3d 446, 456 (7th Cir. 1996) (court must ask "whether a reasonable state actor would have known that his actions, viewed in light of the law at the time, were unlawful"). Neither side addresses these questions. Defendants select one among many alleged retaliatory acts, the Board's implementation of an "index card" rule for public comment at meetings, and argue that the rule was a reasonable time, place and manner restriction under the First Amendment. Mnyofu, without the benefit of counsel, simply argues the opposite. This case,

however, is not about the facial validity of a Board rule. It is a retaliation case involving alleged punishment for disfavored speech. In any event, the immunity question is premature. Although the complaint is sufficient to state a claim on the First Amendment counts, we do not yet know each defendant's alleged role in the retaliation. So until the record is further developed, we are not in a position to determine which defendants, if any, may be entitled to immunity.

This brings us to the intentional infliction of emotional distress claim. Under Illinois law, the elements of a claim for intentional infliction of emotional distress are as follows: (i) the conduct involved must be truly extreme and outrageous; (ii) the defendants must either intend the infliction of emotional distress or know that there is a high probability that their conduct will result in such distress; and (iii) the conduct must in fact cause severe emotional distress. See McGrath v. Fahey, 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806, 809 (1988). Mindful of our obligation to construe *pro se* complaints liberally, Mnyofu has stated a claim based on the First Amendment retaliation allegations. If, as he contends, defendants struck back at him – by intimidating him at Board meetings, barring him from Rich Central, posting "wanted posters" throughout the school, and otherwise soiling his name in the community – and solely for speaking out on matters of public concern, he may be entitled to

relief. Defendants correctly assert that the claim is time-barred insofar as it is based on the alleged fabrication of child abuse.

Finally, Mnyofu's request for declaratory relief is denied because this court is not the proper forum to seek relief from the decisions of the DCFS or the Cook County Circuit Court. See Young v. Murphy, 90 F.3d 1225, 1230 (7th Cir. 1996) ("[L]itigants who feel a state proceeding has violated their constitutional rights must appeal that decision through their state courts and thence to the Supreme Court.").

In sum, Counts I through III, which allege violations of Mnyofu's Fourteenth Amendment rights in the upbringing of his child, are dismissed as untimely. The First Amendment retaliation claims, Counts IV and V, will stand except for the allegation that Mnyofu was retaliated against for objecting to defendants' unauthorized contact with his son. Count VI, claiming intentional infliction of emotional distress, states a claim save the limitation discussed above, and Count VII is dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss [37-1] is granted as to Counts I, II, III and VII, and denied as to Counts IV, V and VI.

DATE:   November 1, 2005

ENTER:  _____
        John F. Grady, United States District Judge