**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


KOMAA MNYOFU,                          )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )
                                       )
BOARD OF EDUCATION OF RICH             )     03 C 8717
TOWNSHIP HIGH SCHOOL DISTRICT 227,     )
a unit of local government, Cook       )
County, Illinois, BRIAN KNUTSON,       )
individually and in his official       )
capacity, LARRY TANDY, individually)
and in his official capacity,          )
ROSEANNE WILLIAMSON, individually  )
and in her official capacity, HELGA)
SPOOLSTRA, individually and in her )
official capacity, SELMA McDONALD, )
individually and in her official   )
capacity, VIOLA BAECHER,               )
individually and in her official   )
capacity, DIANE KOLOSH,                )
individually and in her official   )
capacity, EDWIN A. BURNETTE,           )
individually and in his official   )
capacity, JANICE TAYLOR,               )
individually, HOWARD HUNIGAN,          )
individually and in his official   )
capacity                               )
                                       )
                    Defendants.        )


**MEMORANDUM OPINION & ORDER**

        In this 42 U.S.C. § 1983 action, plaintiff Komaa Mnyofu has

sued various members of the faculty, administration, and Board of

Education of Rich Township High School District 227, as well as

his ex-wife, claiming that the defendants deprived him of his

First Amendment rights, retaliated against him for exercising
those rights, engaged in a conspiracy to deprive him of his First
Amendment rights, and intentionally inflicted emotional distress
upon him.  The case is now before the court for ruling on the
District 227 defendants'[1] motion for summary judgment and their
motion to strike plaintiff's responses to defendants' statement
of uncontested facts.  For the reasons explained below, both the
motion to strike and the motion for summary judgment are granted
in part and denied in part.

## DISCUSSION

**I.  MOTION TO STRIKE**

Before addressing the motion for summary judgment, it is
first necessary to rule on defendants' motion to strike plaintiff
Komaa Mnyofu's responses to their Local Rule 56.1 statement of
undisputed facts.  Although entitled a motion to strike, it is
really a motion asking the court to deem certain facts admitted
on the ground that plaintiff's responses were insufficient and/or
improper under Local Rule 56.1(b)(3)(B).  Specifically,
defendants contend that because plaintiff's responses to
statements 1-7, 21, 23-28, 34-35, 38, 40, 45, 48 and 49 do not
constitute proper denials, those facts should be deemed admitted.

---

[1] For the remainder of this opinion, references to "defendants" mean the
District 227 defendants unless otherwise specified.  As explained in Section II.A
below, the District 227 defendants include all of the named defendants except
plaintiff's ex-wife, Janice Taylor, who is the only defendant not employed by
Rich Township High School District 227.  Taylor does not have a pending motion
for summary judgment.  In fact, the docket indicates that Taylor has not
participated in this case since filing her answer to plaintiff's reinstated pro
se complaint on May 25, 2005.  Although plaintiff included Taylor as a defendant
in the Second Amended Complaint filed on May 31, 2006, there is no indication in
the record whether Taylor ever received the Second Amended Complaint.

In this district, all parties must comply with Local Rule 56.1 which governs motions for summary judgment. The rule requires the movant to file a statement of material facts demonstrating why the movant contends it is entitled to judgment as a matter of law. This statement "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." N.D. Ill. L.R. 56.1(a). Paragraph (b)(3) of the rule requires the opposing party to respond to each numbered paragraph in the movant's L.R. 56.1(a)(3) statement and further provides that in order to contest any fact set forth by movant, "the opposing party must expressly state its disagreement and include 'specific references to the affidavits, parts of the record, and other supporting materials' that establish the basis for the disagreement." Gilbert v. American Airlines, Inc., No. 01 C 3088, 2004 WL 783362, at *1 (N.D. Ill. Jan. 7, 2004) (quoting N.D. Ill. L.R. 56.1(b)(3)). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." N.D. Ill. L.R. 56.1(b).

In light of L.R. 56.1's explicit requirements, we agree that many — though not all — of plaintiff's challenged answers are flawed. For example, plaintiff raised relevance objections to

several facts rather than providing specific references to the record to support a proper denial. (E.g., Pl.'s Resp. to Defs.' L.R. 56.1 Statement of Undisputed Facts ("Pl.'s Resp. to DSUF") at ¶¶ 3, 5, 35, 48, 49.) In other responses, the specific record citations offered by plaintiff do not refute the fact at issue (although the citations, at times, do provide additional factual context to consider). (E.g., id. at ¶¶ 21, 23-28.) There were other flaws as well, but we find it unnecessary to specifically discuss each one individually.

After reviewing the parties' respective positions on each of the challenged responses, we deem the following facts admitted: DSUF ¶¶ 3-7, 21, 23-28, 34, 35, 38,[2] 40, 45, 48 and 49. DSUF ¶¶ 1 and 2, on the other hand, are not deemed admitted because those facts are supported only by co-defendant Janice Taylor's unsigned responses to the District 227 defendants' requests to admit. We realize that under Rule 36 of the Federal Rules of Civil Procedure, a party may serve a written request for admission on "any other party" — including a co-defendant. And, generally speaking, admissions may be considered in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c). But Rule 36 admissions "are still subject to the limitation on hearsay

---

[2] DSUF ¶ 38 states "Mr. Mnyofu has no knowledge that teachers or members of the public were directed to boo and/or hiss at him at meetings of the board of education by any of the named defendants." We are deeming DSUF ¶ 38 admitted because the statement is both true and properly supported. Significantly, however, Mnyofu has never claimed that any of the named defendants directed others to boo and hiss at him. The relevance of this fact is therefore questionable.

evidence and must fit within an exception to the rule to be properly admitted[.]" <u>Walsh v. McCain Foods Ltd.</u>, 81 F.3d 722, 726 (7th Cir. 1996); <u>see</u> <u>Eisenstadt v. Centel Corp.</u>, 113 F.3d 738, 742 (7th Cir. 1997) (aside from affidavits and deposition testimony, hearsay is inadmissible for summary judgment unless it falls within exception under Federal Rules of Evidence). Admissions of a party-opponent are not hearsay, Fed. R. Evid. 801(d)(2), and thus may be considered in ruling on a motion for summary judgment. But co-defendant Taylor is not the District 227 defendants' party opponent. Her admissions are hearsay and defendants make no argument that they fall within any exception to the hearsay rule. Moreover, even if hearsay were not an obstacle (which it is), we are precluded from considering Taylor's admissions because the admissions submitted to the court were not signed as required under Rule 36. Fed. R. Civ. P. 36 (answers to requests to admit must be signed by party or attorney); 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2259 (1994) (after amendment, response need only be signed, not sworn).

Defendants' motion to strike is therefore granted in part and denied in part and DSUF ¶¶ 3-7, 21, 23-28, 34, 35, 38, 40, 45, 48 and 49 are deemed admitted.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Background[3]

Plaintiff Komaa Mnyofu has sued the Board of Education of Rich Township High School District 227 (the "Board"), Board President Edwin Burnette, former Superintendent Brian Knutson, current Superintendent Howard Hunigan, Assistant Superintendent Larry Tandy, as well as five members of Rich Central High School's ("Rich Central") faculty and administration — principal Selma McDonald, assistant principal Roseanne Williamson, dean of students Helga Spoolstra, school social worker Viola Baecher and school nurse Diane Kolosh (collectively, the "District 227 defendants" or simply "defendants").  The only defendant who was never employed by District 227 is plaintiff's ex-wife, Janice Taylor.  According to plaintiff's Second Amended Complaint, defendants (including Taylor)[4] (1) violated 42 U.S.C. § 1983 by depriving him of his First Amendment rights to free speech and retaliating against him for exercising those rights, (2) engaged in a conspiracy to retaliate against him for exercising his First Amendment right to speak out on matters of public concern, and (3) subjected him to the intentional infliction of emotional distress.

---

[3]  Unless otherwise noted, the following facts are undisputed and are drawn from the parties' L.R. 56.1 statements.

[4]  Plaintiff brought each of the three counts against "Defendants" collectively, including Taylor.

This dispute stems from a series of interactions between plaintiff and various members of the faculty, administration and the Board from Fall 2002 through Spring 2005. At the times relevant to this case, plaintiff's son Shamari Jones was a student at Rich Central.  As a parent and member of Rich Central's Parent Teachers Student Organization ("PTSO"), plaintiff has been very active and vocal with the administration and Board about various issues (including controversial ones) over the years.[5]

During the fall of 2002, rainbow triangles were hung at various locations at Rich Central; the purpose of the rainbow triangles evidently was to designate "safe zones" for homosexual students and/or to indicate tolerance toward the homosexual community.[6]  The rainbow triangles became a controversial topic in the Rich Central community.  At the October 2002 Board meeting, plaintiff first asked the Board what the rainbow

---

[5] Plaintiff describes many of his interactions at Board meetings and with the administration in an affidavit submitted in opposition to defendants' L.R. 56.1(a)(3) statement of facts.  However, plaintiff opted not to include most of the facts set forth in his affidavit in his L.R. 56.1(b) statement of additional facts, so defendants had no obligation to respond. See Brandt v. Bd. of Educ. of the City of Chicago, 420 F. Supp. 2d 921, 926 (additional facts should be set forth in separate L.R. 56.1 statement of additional facts, not in the response to the opponent's L.R. 56.1(b)(3) statement). Unless specifically noted, the facts set forth in plaintiff's affidavit are not undisputed. Further, although we decline to reiterate all of the facts set forth in plaintiff's affidavit, we have considered his affidavit in reaching our decision on the motion for summary judgment.

[6] This fact is gleaned from various documents, including the Second Amended Complaint, plaintiff's deposition and defendant Burnette's deposition. (Sec. Am. Compl. ¶ 33; Pl. Dep. at 18:19-19:7; Burnette Dep. at 24:8-14.) Although both sides refer to the rainbow triangle issue, neither sets forth the facts explaining the issue in their L.R. 56.1 statements.

triangles were and who approved them.  At the December 16, 2002
Board meeting, the issue of the rainbow triangles was discussed
again.  Many members of the community spoke out against the
rainbow triangles at this Board meeting.  The Board eventually
voted to remove the rainbow triangles from the school.

Earlier, on December 2, 2002, plaintiff and his son had
gotten into a physical tussle when plaintiff grabbed his son by
the shirt.  Shamari's mother, defendant Taylor, called school
social worker Baecher on December 3, 2002 and informed her about
the incident between Shamari and his father.[7]  After the phone
call, Baecher called Shamari to her office; during his subsequent
meeting with Baecher, Shamari told her about the physical
altercation with his father.  Baecher then sent Shamari to see
the school nurse, defendant Kolosh.  As a school social worker,
Baecher is a mandated reporter, which means she must report
allegations of abuse to the Illinois Department of Children and
Family Services ("DCFS").  After speaking with Shamari and having
him physically examined by the nurse, Baecher contacted DCFS
about the incident between Shamari and his father.  On December
3, 2002, Baecher also informed principal McDonald about the
allegations of abuse.  As a result of the allegations, a court
order was issued barring plaintiff from having contact with

_____

[2/]  Taylor and Baecher had spoken once or twice earlier in the semester.
Taylor had contacted Baecher to find out how her son was doing in school. After
meeting with Shamari, Baecher phoned Taylor to inform her that her son was not
experiencing any problems.

Shamari.[8]  Based on the court order, principal McDonald issued

plaintiff a "no trespass" letter barring him from coming onto

campus.

Plaintiff continued to attend and participate in Board

meetings.  At some point in late 2002 or early 2003, the Board

implemented new guidelines for running its meetings, particularly

relating to handling the public comment portions of Board

meetings.  The purpose and precise nature of these guidelines is

disputed.  However, it appears to be undisputed that the changes

included (1) requiring citizens to fill out index cards with

their name and the topic they wanted to address if they wanted to

speak during the public comment portion of the meeting, and

(2) limiting comments to 2-3 minutes per citizen.  According to

plaintiff, the new guidelines were implemented to silence him and

other community members as the result of the protest he led

against the rainbow triangles and his criticism of other Board

policies.  Former Board President Burnette, however, explains

that the new guidelines were implemented out of concerns that

Board meetings were not being run efficiently and that too much

time was being spent on the public comment portion.  (Burnette

Dep. at 27:16-24.)  After the new guidelines were implemented,

there were occasions when, because of the time limits, plaintiff

---

[8]  Plaintiff attests that on April 15, 2003, he was cleared of all charges
relating to the December 2, 2002 incident with his son.  Although this fact was
not included in the parties' respective Local Rule 56.1 statements of undisputed
facts, we note it for purposes of clarity.

was cut off from speaking during Board meetings and other occasions when plaintiff was not allowed to speak. Additionally, on at least one occasion, Burnette told plaintiff that he would be removed from the meeting if he did not stop speaking. (See generally, id. at 39:22-43:2.)

According to plaintiff, during the time his son attended Rich Central, school security officers were instructed to follow and monitor him while he was on school property, including during Board meetings. (Pl.'s Aff. ¶ 4.) Defendants dispute that security personnel were instructed to monitor plaintiff at Board meetings. (DSUF ¶ 11, citing sources.) However, there is evidence that McDonald instructed security officers to ensure that when plaintiff was on campus, he only went to the location designated on his visitors' pass, and to inform her whenever plaintiff was on school property. (See generally, Frye Dep. at 38:10-42:24).

On April 7, 2005, a series of student assemblies was held during the school day in an auditorium at Rich Central; different groups of students came to assemblies throughout the day. Although the meetings were student forums, members of the PTSO (and possibly other members of the public) were also invited to, and did, attend. The parties dispute the reason for the

assemblies.[9]  In any event, during the course of one of the
assemblies, a student asked a question regarding teachers'
performance and discipline for teachers who performed poorly.
After McDonald answered the question, plaintiff raised his hand
to be recognized by the panel because he considered her answer to
be inadequate.[10]  The student moderator then called on plaintiff.
When McDonald attempted to interject while plaintiff was
speaking, he responded that he was not there to debate with her.
Security officials subsequently came to the auditorium after
receiving a call from assistant principal Celeste Nelson, and
asked plaintiff to leave.  It is disputed whether Nelson
independently made the decision to call security or whether she
called at McDonald's direction.  McDonald herself has given
conflicting answers on this issue.  At her deposition, McDonald
testified that she was not responsible for summoning security to
the auditorium, yet on the videotape of the assembly, McDonald
can be heard saying that she called security.  (Compare McDonald

---

[9]/  According to defendants, "the purpose of the forum[s] was for the
students to identify strategies to take ownership and improvement of the school."
(DSUF ¶ 12, citing McDonald Dep. at 126.)  Plaintiff, however, asserts that the
assemblies were called after the PTSO demanded an apology from the administration
for a survey it issued to the students which many parents and students
interpreted as blaming the black students for the school's poor academic record.
(Veazey Aff. ¶¶ 2-3; Pl. Aff. ¶ 20.)

[10]/  Plaintiff objected to this statement of fact, arguing that defendants
were speculating about how he felt about McDonald's response.  (See Pl.'s Resp.
DSUF ¶ 15.)  Given that the fact is based directly on plaintiff's deposition
testimony, in which he specifically testified that "Dr. McDonald provided an
answer that was inadequate," we find his objection disingenuous.  (See Pl.'s Dep.
at 129:19-21.)  Paragraph 15 of Defendants' L.R. Statement of Facts is deemed
admitted.

Dep. at 128:2-5 <u>with</u> Exhibit 11, videotape of 4.7.05 assembly.)
Regardless, security came and asked plaintiff to leave the
assembly.  According to Officer Mark Akiyama, one of the security
officers who responded to Nelson's call, when he arrived at the
auditorium, Nelson instructed him that Mnyofu had to leave.
(Akiyama Dep. at 14:2-15.)  But upon seeing security ask
plaintiff to leave, McDonald told the officer that plaintiff
could stay in the auditorium.[11]  Plaintiff left the auditorium
with security and continued the discussion in the hallway.  At
some point after plaintiff left, McDonald invited plaintiff back
into the auditorium.  Plaintiff did not return to the assembly,
however.  According to plaintiff, although McDonald initially
told security he could stay, she later told Officer Carl Frey to
eject plaintiff from the building for being disorderly.
According to McDonald, when she told plaintiff he could return to
the auditorium, he responded by yelling and calling her names, so
she instructed Officer Frey to eject him from the building.
(McDonald Dep. at 136:17-137:8.)

The following day, on April 8, 2005, a faculty meeting was
held which was attended by McDonald, Superintendent Hunigan and
Board President Betty Owens, among others.  According to Hunigan
and McDonald, some teachers voiced concerns about Mnyofu's

---

[11]/  This fact, set forth in ¶ 17 of Defendants' L.R. 56.1 Statement, is
deemed admitted because the fact is properly supported and Plaintiff's denial
pertains only to whether McDonald was responsible for having Nelson call
security.

conduct the day before, expressing concerns about safety and disruption of school activities.[12]  After the meeting, Hunigan issued a letter to plaintiff (referred to as a no-trespass letter) which barred him from being on campus during school hours.

A few days later, on April 12, 2005, plaintiff arrived at Rich Central to attend a PTSO meeting.  He saw dean of students Spoolstra enter the school, then minutes later he was surrounded by three squad cars.  Officer Frey originally told him he could not enter the school based on the no-trespass letter Hunigan had issued.  After eventually receiving a copy of the letter to review, however, plaintiff pointed out that the ban was effective from 7:00 a.m. to 4:00 p.m.  As a result, he was allowed to attend the PTSO meeting, which was held after 6:00 p.m.

Based on the foregoing facts, defendants argue that they are entitled to summary judgment on plaintiff's First Amendment, conspiracy and intentional infliction of emotional distress

---

[12]/  DSUF ¶¶ 21-22; ¶ 22 is deemed admitted despite plaintiff's denial because his denial is improper. In denying ¶ 22, plaintiff responds that "[c]ertain Caucasian teachers demanded that the administration ban plaintiff from the school because he had been critical of the Teacher's Union." (Pl.'s Resp. to DSUF at ¶ 22.)  There are several problems with this assertion. For one thing, the affidavits plaintiff cites establish only that "a number of teachers' union officials . . . were upset" because plaintiff had been critical of the union during the April 7th assembly, not that the teachers demanded that plaintiff be banned.  (Dr. Sunni Ali Aff. ¶ 6.)  Moreover, the affidavits he cites do not refute defendants' evidence that some teachers voiced concerns about plaintiff's conduct and safety: the fact that some teachers were upset because plaintiff was critical of the teachers' union does not mean that other teachers did not express concerns about the disruptive effect of plaintiff's conduct.  Moreover, it is inappropriate to set forth additional facts in a response to the opponent's L.R. 56.1(b)(3) statement; rather, additional facts should be set forth in a separate L.R. 56.1 statement of additional facts.  Brandt, 420 F. Supp. 2d at 926.

claims because no reasonable jury could find in favor of plaintiff.

**B.    Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. Anderson, 477 U.S. at 248.

## C. Analysis

### 1. First Amendment

In the Second Amended Complaint, plaintiff alleges that through a multitude of acts spanning several years, defendants engaged in conduct that violated his First Amendment right to free speech and/or retaliated against him for exercising his right to free speech, thus violating 42 U.S.C. § 1983. It is evident to the court that in bringing this claim, plaintiff threw a lot of allegations into the complaint, hoping that something would stick. Although plaintiff presumably brings the claim against all defendants (including his ex-wife), he has no actionable First Amendment claim against most of the defendants.

For example, as defendants point out, there are no allegations against defendants Baecher, Kolosh, Spoolstra, Tandy or Williamson implicating a violation of plaintiff's First Amendment rights.[13] Plaintiff makes no effort to refute defendants' argument, thus effectively conceding he has no viable First Amendment claim against those defendants.

Likewise, although plaintiff alleges that defendants Knutson and Burnette retaliated against him for exercising his First Amendment rights, his claim fails as a matter of law. To establish a retaliation claim, plaintiff must establish: (1) that

---

[13]/ Although plaintiff's ex-wife, Taylor, has not filed a motion for summary judgment, it is evident that there are no allegations that she violated plaintiff's First Amendment rights, either.

he "was engaged in a constitutionally protected activity;
(2) that the defendant's adverse action caused the plaintiff to
suffer an injury that would likely chill a person of ordinary
firmness from continuing to engage in that activity; and (3) that
the adverse action was motivated at least in part as a response
to the exercise of the plaintiff's constitutional rights."
Villagrana v. Vill. of Oswego, No. 04 C 4603, 2005 WL 2322808, at
*2 (N.D. Ill. Sept. 22, 2005) (citing Suarez Corp. Indus. v.
McGraw, 202 F.3d 676, 687 (4th Cir. 2000) and assuming Seventh
Circuit would apply same standard to non-employee plaintiffs as
to employee plaintiffs).  However, "[n]ot every retaliatory act
committed by a public official is actionable under § 1983."  Id.
at *3 (citing Suarez, 202 F.3d at 687).  "In particular, 'where a
public official's alleged retaliation is in the nature of speech,
in the absence of threat, coercion, or intimidation intimating
that punishment, sanction or adverse regulatory action will
imminently follow, such speech does not adversely affect a
citizen's First Amendment rights.'" Id.  (quoting Suarez, 202
F.3d at 687).  Regarding defendant Knutson, plaintiff points only
to instances where Knutson was hostile towards him or did not
reprimand others for booing, hissing, or otherwise attacking him
at Board meetings.  As for defendant Burnette, plaintiff claims
he instituted policies to restrict citizen participation at Board
meetings, failed to stop others from booing and hissing at

plaintiff, and threatened to have plaintiff removed from a Board
meeting for speaking in excess of the time limit imposed on
citizens.  We agree with defendants that none of these
allegations support a First Amendment claim against Knutson or
Burnette – a conclusion with which plaintiff evidently agrees,
given his decision not to address the argument in responding to
the motion for summary judgment.

The only viable aspect of plaintiff's First Amendment claim
is his contention that his rights were violated on April 7, 2005
when he was removed from the assembly.  According to plaintiff,
he was forcibly ejected from the April 7th assembly for
criticizing the teachers' union.  The only defendants implicated
in this claim are McDonald, who may have ordered plaintiff's
removal, and the Board, if there is a basis for <u>Monell</u> liability.
Defendants contend they are entitled to summary judgment, arguing
that they were entitled to restrict plaintiff's speech at the
April 7th assembly because it was a nonpublic forum that was not
established for plaintiff's benefit.  Plaintiff, however,
counters that "there is a genuine issue for trial regarding
whether [d]efendants engaged in impermissible viewpoint
discrimination."  (Pl.'s Resp. at 9.)  For the reasons that
follow, we agree with plaintiff.

The extent to which a government can impose restrictions on
speech without violating the Free Speech Clause of the First

Amendment depends on the nature of the forum.  Christian Legal
Soc'y v. Walker, 453 F.3d 853, 865 (7th Cir. 2006).  According to
the Seventh Circuit, there are traditionally three types of
forums: the traditional public forum, the designated public forum
and the nonpublic forum.  DeBoer v. Vill. of Oak Park, 267 F.3d
558, 565 (7th Cir. 2001) (citing cases).  "A traditional public
forum, such as a street or a park, is property that by long
tradition or by government fiat . . . has been devoted to
assembly and debate whereas a designated forum is a nonpublic
forum that the government has intentionally opened for public
discourse.  Id. at 565 (citation and internal quotation marks
omitted).  "In both a traditional and designated public forum,
reasonable time, place and manner regulations are permissible,
but any content-based prohibition is permissible only if it is
necessary to serve a compelling state interest and is drawn
narrowly to achieve that interest."  Id. at 566 (citing Cornelius
v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 800 (1985)).  In
other words, content-based restrictions in such forums are
subject to strict scrutiny.  See Christian Legal Soc'y, 453 F.3d
at 865.  Restrictions imposed on speech in nonpublic forums, in
contrast, are subject to less rigorous scrutiny.  In nonpublic
forums, the government may impose restrictions "as long as the
restrictions are 'reasonable and [are] not an effort to suppress
expression merely because public officials oppose the speaker's

view.'"[14] <u>Cornelius</u>, 473 U.S. at 800. Moreover, a restriction

imposed in a nonpublic forum "need only be <u>reasonable</u>; it need

not be the most reasonable or the only reasonable limitation."

<u>Id.</u> at 808 (emphasis in original).

We agree with defendants that the school assembly on April

7th was a nonpublic forum. For one thing, although plaintiff

urges the court not to accept defendants' characterization of the

assembly as a nonpublic forum, he makes no effort to argue that

it was a public forum. Plaintiff has thus "failed to overcome

the general rule that a school is not presumed to be a public

forum." <u>Vukadinovich v. Bd. of School Tr. of Michigan City Area</u>

<u>Sch.</u>, 978 F.2d 403, 409 (7th Cir. 1992) (internal quotation marks

and citation omitted). Moreover, nothing in the record supports

a conclusion that the assembly was anything other than a

nonpublic forum. It certainly was not a traditional public

forum. As the Supreme Court has explained, "public schools do

not possess all of the attributes of streets, parks, and other

traditional public forums that . . . have been used for purposes

of assembly, communicating thoughts between citizens, and

---

[14]/ Adding confusion to forum analysis, the Supreme Court has also used the
term "limited public" forum. <u>Christian Legal Soc'y</u>, 453 F.3d at 865 n. 2 (citing
cases). That term has sometimes been used to describe a type of designated
public forum, which would be subject to strict scrutiny, but more recently the
term has been used interchangeably with "nonpublic" forum, which is subject to
lower scrutiny. <u>Id.</u> (collecting cases). In the more recent cases, "limited
public forum" refers to "a forum that the state has reserved 'for certain groups
for the discussion of certain topics"; in such forums, "any restriction must be
viewpoint-neutral and reasonable in light of the purpose served by the forum."
<u>DeBoer</u>, 267 F.3d at 566 (discussing Supreme Court cases).

discussing public questions." <u>Hazelwood School Dist. v.
Kuhlmeier</u>, 484 U.S. 260, 267 (1988) (internal quotation marks and
citations omitted). Nor was the assembly a designated public
forum. "The government does not create a public forum by
inaction or by permitting limited discourse, but only by
intentionally opening a nontraditional forum for public
discourse." <u>Id.</u> (citations and internal quotation marks
omitted). Thus, a school creates a designated public forum only
when "school authorities have 'by policy or by practice' opened
those facilities 'for indiscriminate use by the general public,'
or by some segment of the public, such as student organizations."
<u>Id.</u> (internal citations omitted). Although there do no appear to
be any cases directly on point, the logical conclusion is that an
assembly held for students at school during school hours is a
nonpublic forum, notwithstanding the fact that parents also
attended. If the April 7th school assembly had been for students
and faculty only, there would be no question that it was a
nonpublic forum. The fact that parents also attended the
assembly does not change that result. There is no record
evidence that in holding the April 7th assembly, Rich Central was
opened to anyone for "indiscriminate use." <u>Id.</u>

Because the school assembly was a nonpublic forum,
defendants were entitled to impose restrictions on plaintiff's
speech during the assembly as long as the restrictions were

reasonable and were not imposed solely to suppress plaintiff's viewpoint. Cornelius, 473 U.S. at 800; Anderson v. Milwaukee County, 433 F.3d 975, 979-980 (7th Cir. 2006). Although defendants urge the court to conclude, as a matter of law, that it was reasonable to remove plaintiff from the assembly, we cannot grant summary judgment on this issue.

First, to the extent defendants argue that it was reasonable to exclude plaintiff from the assembly because the forum was not created for plaintiff's benefit, we decline to grant summary judgment on that basis. Admittedly, the government may exclude a speaker from a nonpublic forum if the speaker "is not a member of the class of speakers for whose especial benefit the forum was created[.]" Cornelius, 473 U.S. at 806. Defendants' argument thus might be persuasive if the April 7th assembly was strictly for students and school personnel, but the evidence shows that was not the case. Rather, even though the April 7th assembly was ostensibly for the students, parents and members of the PTSO were welcome to, and did in fact, attend. So even though as a general rule "[m]embers of the public have no constitutional right of access to public schools," Vukadinovich, 978 F.2d at 409, Rich Central chose to open the assembly to parents like plaintiff. "Once the [school] has set the boundaries of its forum, it may not renege; it must respect its own self-imposed boundaries." Christian Legal Soc'y, 453 F.3d at 866 (citing Rosenberger v.

Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)).
The record shows that according to the boundaries Rich Central
set, parents were not only allowed to attend the assembly, they
were allowed to participate.  Consequently, arguing that it was
reasonable to impose restrictions on plaintiff simply because he
was a parent is obviously incorrect.

Defendants' other reasonableness argument carries greater
weight.  According to defendants, it was reasonable to remove
plaintiff because his conduct in challenging McDonald caused a
material disruption at the assembly.  We agree that under the
reasonableness standard applicable to nonpublic forums, e.g.,
Cornelius, 473 U.S. at 800, Hazelwood, 484 U.S. at 266, school
officials generally have the authority to restrict disruptive
speech at a school assembly.  "The First Amendment does not
forbid a viewpoint-neutral exclusion of speakers who would
disrupt a nonpublic forum and hinder its effectiveness for its
intended purpose."  Cornelius, 473 U.S. at 811.  Moreover, the
Supreme Court has "repeatedly emphasized the need for affirming
the comprehensive authority . . . of school officials, consistent
with fundamental constitutional safeguards, to prescribe and
control conduct in the schools."  Tinker v. Des Moines Indep.
Cmty. Sch. Dist., 393 U.S. 503, 507 (1969).

The problem for defendants is that, despite their argument
to the contrary, there are disputed questions of material fact

regarding the reason for plaintiff's removal from the assembly which preclude summary judgment. Whereas defendants contend plaintiff was removed for being disruptive (i.e., for the manner in which he was speaking), plaintiff maintains that he was removed because he criticized the teachers' union and their contract (i.e., for the content of his speech).

Although there is a videotape of part of the April 7th assembly (which is really more of an audiotape since the camera was pointed at the floor much of the time), the court is unable to grant summary judgment based on the tape. The tape simply is not dispositive – both sides could make arguments to a jury based on its contents. By way of example only, although there is some evidence of a disturbance before security arrived — there was enough of a disruption that the student moderator attempted to calm the students down — during our review, it sounded like much of the commotion (including plaintiff's yelling) started after security showed up and told plaintiff he had to leave. A jury will have to decide whether McDonald intended to suppress plaintiff's speech based on its content or whether she genuinely believed that the disruption he caused justified his removal.[15]

---

[15]/ Several factual issues may affect the jury's conclusion, including the extent of the disruption plaintiff caused, and whether the disruption occurred before or after the call to security. For example, if McDonald was responsible for Nelson making the call and the call was made before there was any commotion in the auditorium, that may undermine defendants' position. (We say "may" because perhaps a jury could conclude that security was justifiably called as a precaution, but by the time security arrived there was a commotion sufficient to justify plaintiff's removal.)

Additionally, before making that determination, a jury will have to decide whether McDonald bears responsibility for having plaintiff removed from the assembly.  If, for example, Nelson called security without any direction from McDonald, that fact would seriously undermine plaintiff's claim.  If Nelson told security to remove plaintiff from the assembly and she made that decision on her own, there would no basis to hold McDonald liable.  (And plaintiff did not sue Nelson, so she faces no liability.)

As for the Board, whether there is a basis for holding it liable under <u>Monell</u> for removing the plaintiff from the assembly remains to be seen.  Neither side addressed this issue in briefing the motion for summary judgment, so we shall not decide it.[16]  We note, however, that to recover against the Board under § 1983, plaintiff must establish either that "(1) the Board has an express policy that, when enforced, causes a constitutional deprivation; (2) the Board has a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled that it constitutes custom or usage with[] the force of law; or (3) a person with final policymaking authority caused the constitutional injury."  <u>Brandt v. Bd. of Educ. of the City of Chicago</u>, 420 F. Supp. 2d 921, 936 (N.D. Ill.

_____

[16]/  Defendants presumably hoped we would grant summary judgment in favor of  the individual defendants on all claims, which would thus entitle the Board to summary judgment on all claims as well.  Because the issue of McDonald's liability remains open, the Board's liability is also an open question.

2006) (citing <u>Calhoun v. Ramsey</u>, 408 F.3d 375, 379 (7th Cir. 2005); <u>see</u> <u>Monell v. Dept. of Soc. Serv. of the City of New York</u>, 436 U.S. 658, 691-693 (1978)).  As relevant here, the only issue appears to be whether plaintiff can prove that a person with final policymaking authority caused a constitutional injury.

Notably, even if a jury finds McDonald liable for a First Amendment violation, it does not necessarily follow that there is a basis for imposing <u>Monell</u> liability against the Board.[17] "<u>Monell</u>'s 'policymaker' prong is not a simple determination of whether a person with policy making authority caused a constitutional deprivation."  <u>McGreal v. Ostrov</u>, No. 98 C 3958, 2002 WL 1784461, at *3 (N.D. Ill. Aug. 1, 2002).  "The 'policymaker' prong of <u>Monell</u> requires more than the act of a policymaker.  It is necessary for the policymaker's act to have been in conformance with, or in the creation of, governmental rules that have the effect of law (and then the rule must violate the plaintiff's constitutional rights)."  <u>Id.</u> (citing <u>Auriemma v. Rice</u>, 957 F.2d 397, 400 (7th Cir. 1992) and <u>Gernetzke v. Kenosha Sch. Dist. No. 1</u>, 274 F.3d 464, 469-470 (7th Cir. 2001)).  Moreover, "a policymaker's decision will rarely have the force of policy unless the decision will govern similar issues in the future."  <u>Id.</u>; <u>see</u> <u>Auriemma</u>, 957 F.2d at 400 ("Unless today's

_____

[17]  Alternatively, in the event a jury finds that only Nelson, not McDonald, was responsible for removing plaintiff from the assembly and that his removal violated his constitutional rights, plaintiff could attempt to hold the Board liable for Nelson's conduct if he can satisfy <u>Monell</u>'s policymaking prong.

decision ought to govern tomorrow's case under a law or custom with the force of law, it cannot be said to carry out the municipality's policy."). The parties should bear the standards for <u>Monell</u> liability in mind as this case proceeds.

Finally, plaintiff asserts that Hunigan unlawfully retaliated against him by banning him from school property after the April 7th incident. But restricting plaintiff's access to the school is not a First Amendment violation — "[m]embers of the public have no constitutional right of access to public schools." <u>Vukadinovich</u>, 978 F.2d at 409. Furthermore, plaintiff does not argue, nor is there any evidence to suggest, that Hunigan issued the ban because of any viewpoint plaintiff expressed at the assembly. The only evidence in the record is that Hunigan issued the ban based on his understanding that plaintiff had been disruptive, which caused concerns among the faculty. (<u>E.g.</u>, Hunigan Dep. at 44:9-45:20; 49:12-21.) Plaintiff's First Amendment claim thus fails as it pertains to Hunigan.

For the reasons explained above, the court grants summary judgment in favor of defendants Baecher, Burnette, Hunigan, Knutson, Kolosh, Spoolstra, Tandy and Williamson on plaintiff's First Amendment claim. Only his First Amendment claim against defendant McDonald and the Board arising out of the April 7, 2005 assembly survives summary judgment.

2. **Conspiracy**

Plaintiff has also raised a conspiracy claim in which he alleges that the District 227 defendants (except Hunigan) conspired with his ex-wife, Taylor, to deprive him of his First Amendment rights.  As we explain below, defendants are entitled to summary judgment on this claim because there is insufficient evidence to allow a reasonable jury to conclude there was a meeting of the minds among the alleged conspirators.  It makes no difference whether plaintiff's conspiracy claim arises under § 1983[18] or Illinois common law — the claim is not viable.[19] Under either law, there must be factual proof of an agreement among the conspirators.  Such evidence is lacking in this case.

---

[18]/  "Although Section 1983, unlike Section 1985(3), does not specifically mention conspiracy in the statute, courts have held that such an action may be maintained under Section 1983."  Gray v. Laws, 915 F. Supp. 762, 763 (E.D.N.C. 1994) (collecting cases).

[19]/  In moving for summary judgment on the conspiracy claim, defendants cited conspiracy cases arising under § 1985(3) in addition to § 1983 cases. E.g., Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002) (§ 1985); Goldschmidt v. Patchett, 686 F. 2d 582, 585 (7th Cir. 1982) (§ 1983).  Plaintiff contends that their reliance on § 1985 caselaw is misplaced because he brought his claim under Illinois common law, not federal law.  We have a few comments.  First, although plaintiff clearly does not have (and does not purport to have) a claim under § 1985(3), which is specific to conspiracy to deprive someone of equal protection of laws,  Green, 281 F.3d at 665, that does not make defendants' reliance on § 1985 caselaw misplaced.  The standard for proving a conspiracy under § 1985 strikes us as analogous to the standard for proving a § 1983 conspiracy claim, and thus the § 1985 cases are relevant.  Second, although plaintiff claims he asserted his conspiracy claim under common law rather than federal law, a plain reading of the Second Amended Complaint would not alert defendants that that was his intention – indeed, the conspiracy count is entitled "Conspiracy 42 U.S.C. § 1983."  The logical conclusion, therefore, is that plaintiff intended to bring a conspiracy claim under § 1983.  Nevertheless, to be thorough, we shall consider whether plaintiff has a viable conspiracy claim under either § 1983 or common law.  In doing so, we express no opinion regarding whether a plaintiff can bypass § 1983 and bring a claim under state common law for conspiracy to violate federal Constitutional rights.

For a conspiracy claim under § 1983, "two elements must be satisfied: (1) an express or implied agreement among defendants to deprive a plaintiff of his or her Constitutional rights and (2) actual deprivation of those rights in the form of overt acts in furtherance of the agreement." <u>Nardoni v. Moke</u>, No. 2002 WL 1610988, at *3 (N.D. Ill. July 22, 2002) (citing <u>Vukadinovich v. Zentz</u>, 995 F.2d 750, 756 (7th Cir. 1993)). "To establish the existence of a conspiracy, a plaintiff must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator." <u>Green v. Benden</u>, 281 F.3d 661, 665 (7th Cir. 2002)(§ 1985 conspiracy claim). "Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." <u>Id.</u> at 665-666; <u>Goldschmidt v. Patchett</u>, 686 F. 2d 582, 585 (7th Cir. 1982) (for § 1983 conspiracy claim, although evidence may be circumstantial, plaintiff must provide factual proof of a meeting of the minds).

Evidence of an agreement to conspire is likewise necessary to prove a common law conspiracy claim. <u>McClure v. Owens Corning Fiberglas Corp.</u>, 720 N.E.2d 242, 258 (Ill. 1999) (proof of agreement is critical element for civil conspiracy claim, which

is an intentional tort requiring proof that defendant "knowingly
and voluntarily participate[d] in a common scheme").

> There is no such thing as accidental, inadvertent or
> negligent participation in a conspiracy.  A defendant
> who innocently performs an act which happens to
> fortuitously further the tortious purpose of another is
> not liable under the theory of civil conspiracy.  A
> defendant who understands the general objectives of the
> conspiratorial scheme, accepts them, and agrees, either
> explicitly or implicitly to do its part to further
> those objectives, however, is liable as a conspirator.

Adcock v. Brakegate, Ltd., 645 N.E.2d 888, 894 (Ill. 1994)
(internal citations omitted).  Further, although a plaintiff may
prove a conspiracy agreement by circumstantial evidence, "that
evidence must be clear and convincing."  McClure, 720 N.E.2d at
258.

In this case, plaintiff's conspiracy theory is that
defendant Taylor enlisted the District 227 defendants to help her
concoct false child abuse charges against him.  The District 227
defendants allegedly shared Taylor's goal of criminalizing
plaintiff so he would lose custody of his son because then his
son would attend a different school (near Taylor), thus ending
plaintiff's criticism of the school and administration once he no
longer had a child enrolled at Rich Central.  Plaintiff further
theorizes that the District 227 defendants were motivated to
participate in the conspiracy to retaliate against him for
exercising his First Amendment rights.  (See generally Pl.'s
Resp. Mem. at 4, 7, 8.)

Plaintiff's evidence of a conspiratorial agreement is woefully deficient, however. The evidence shows there were a few conversations between Taylor and social worker Baecher about plaintiff's son, Shamari, that Baecher had conversations with nurse Kolosh and principal McDonald about the physical tussle between Shamari and his father in December 2002 and that Baecher reported the incident to DCFS. Other than Baecher, the only other defendant Taylor spoke with was assistant principal Williamson in October 2002.[20] After the December incident, a court order was issued barring plaintiff from having contact with Shamari. As a result, McDonald issued a no-trespass letter barring plaintiff from campus.[21] There is also evidence that Board President Burnette and then-Superintendent Knutson discussed the no-trespass letter after it was issued. As for former Assistant Superintendent Tandy, the evidence is scant. At the October 2002 Board meeting, Tandy was present but did not stop others from booing, hissing and otherwise attacking plaintiff.[22] Plaintiff also reportedly saw him whispering to

---

[20] Taylor's conversation with Williamson appears to have been to inform the school about her custody and visitation rights under the court orders in place at the time, and to find out whether Shamari could attend Rich Central if Taylor became the custodial parent and lived in a different school district. The conversation occurred well before the physical tussle between plaintiff and his son and the custody issues that followed that incident.

[21] This is a different no-trespass letter than the one Hunigan issued several years later following the incident at the assembly on April 7, 2005.

[22] This fact is taken from plaintiff's deposition testimony; neither party included this fact in their L.R. 56.1 Statements.

Knutson at a Board meeting, but admittedly could not hear what they were discussing.[23]  Plaintiff further claims that Tandy created a false report in January 2003 to cover up the District 227 defendants' efforts to help his ex-wife get custody; Tandy denies this allegation, attesting that he prepared a report that was true and accurate to the best of his knowledge.  Regarding dean of students Spoolstra, the only evidence offered relates to the April 7, 2005 assembly and its aftermath (which, as explained below, does not support the conspiracy claim).  There is evidence that when plaintiff arrived at Rich Central to attend a PTSO meeting on April 12, 2005, he saw Spoolstra enter the school, then minutes later he was surrounded by three squad cars.  There is also evidence that during a conversation with a student after the April 7th assembly, Spoolstra asked the student whether plaintiff had been bothering him, and also asked "didn't his speech make you scared?" and "[d]on't you think he was trying to cause a riot?"  (T. Battle Aff. ¶¶ 6-7.)  Despite plaintiff's argument to the contrary, we fail to see how those questions can be construed as evidence that Spoolstra tried to convince the student to lie.

Based on the record evidence (as described above as well as other evidence plaintiff raised that we have not specifically mentioned), no reasonable jury could conclude that defendants

_____

[23]/  See n. 22.

knowingly entered an agreement to deprive plaintiff of his
Constitutional rights.  There is evidence of phone calls between
two defendants and Taylor, but the fact that plaintiff's ex-wife
spoke with school personnel is not enough to show a meeting of
the minds.  <u>Alexander v. City of South Bend</u>, 433 F.3d 550, 557
(7th Cir. 2006) (evidence of phone calls between defendants
without more insufficient to establish agreement).  Moreover,
plaintiff's theory (in part) is that his ex-wife conspired with
the District 227 defendants to bring false child abuse charges
against him.  But even assuming that his ex-wife's goal was to
bring false charges, he has no evidence that any of the District
227 defendants knew that was Taylor's purpose, or that the
charges were false.[24]  Rather, the evidence shows that Baecher, a
mandated reporter, made her report to DCFS after confirming the
facts of the incident with Shamari.[25]  Even under common law,
which plaintiff evidently thinks is more lenient, "[a] defendant
who innocently performs an act which happens to fortuitously
further the tortious purpose of another is not liable under the
theory of civil conspiracy."  <u>Adcock</u>, 645 N.E.2d at 894 (to be
liable, party must understand general objectives of conspiracy

---

[24]/  Nor has plaintiff established that false charges were filed.  The fact
that charges against plaintiff were eventually dropped does not mean the physical
tussle between plaintiff and his son did not occur.

[25]/  Despite plaintiff's contention to the contrary, it makes no difference
that Baecher originally heard about the incident from Taylor since Shamari
confirmed the incident.  Plaintiff does not suggest that his son was part of the
conspiracy or otherwise lied about the incident.

and agree to do his part to further those objectives).  Nor does
the fact that some of the District 227 defendants may have spoken
to each other about plaintiff establish the existence of a
conspiratorial agreement to injure him.[26]  See <u>Burgess v. Abex</u>
<u>Corp.</u>, 725 N.E.2d 792, 794 (Ill. App. Ct. 2000) (mere exchange of
information when such exchange is common practice does not
support inference of agreement).  Despite his argument to the
contrary, plaintiff has not provided sufficient circumstantial
evidence to justify a trial.  His conspiracy theory is grounded
on mere speculation, not direct or circumstantial evidence (let
alone evidence a jury could find clear and convincing).  "A
plaintiff's speculation is not a sufficient defense to a summary
judgment motion."  <u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293,
1295 (7th Cir. 1993) (internal quotation marks and citation
omitted).

     In addition to the lack of evidence, and perhaps more
significantly, there are several other fatal problems with
plaintiff's conspiracy theory.  First, to the extent plaintiff
contends that the District 227 defendants conspired with his ex-

---

[26]/  On this point, in responding to defendants' L.R. 56.1 Statement,
plaintiff repeatedly suggests that Baecher "could have spoken" to various other
defendants about plaintiff during the fall of 2002.  But plaintiff bases such
insinuations on Baecher's deposition testimony in which she routinely responded
that although she did not recall speaking to various defendants, she could not
definitively rule out the possibility.  Absent further evidence from plaintiff -
which he does not have - such testimony would not allow a reasonable jury to
conclude that Baecher actually spoke with other defendants about plaintiff in the
fall of 2002.  And even if she did speak with them, it would not establish that
the purpose of her conversations was to conspire against plaintiff.

wife to document false child abuse charges against him so that he
would lose custody, we previously dismissed as time-barred all of
plaintiff's claims relating to the custody issue, including the
conspiracy claim.  <u>Mnyofu v. Bd. of Educ. of Rich Twp. High Sch.</u>
<u>Dist. 227</u>, No. 03 C 8717, 2005 WL 2978735, at *4-5 (N.D. Ill.
Nov. 1, 2005) (ruling on motion to dismiss original complaint).
In a conspiracy claim, a plaintiff may only recover for overt
acts that occurred within the limitations period.  <u>Scherer v.</u>
<u>Balkema</u>, 840 F.2d 437, 439 (7th Cir. 1988).  Given that all
actions pertaining to the custody issue are time barred,
plaintiff's effort to link his ex-wife to the conspiracy is
fruitless.

Second, even if the custody issue were not time barred,
plaintiff's theory strikes us as a convoluted stretch to tie
facts pertaining to custody of his son to retaliation for
exercising his First Amendment rights.  It is obvious why
plaintiff attempts to connect his ex-wife to the conspiracy —
without her involvement, any conspiracy claim against the
District 227 defendants is barred by the intracorporate
conspiracy doctrine.  <u>Payton v. Rush-Presbyterian–St Luke's Med.</u>
<u>Center</u>, 184 F.3d 623, 632 (7th Cir. 1999) (conspiracy cannot
exist solely between members of the same entity);  <u>Doe v. Bd. of</u>
<u>Educ. of Hononegah Cmty. High Sch. Dist. #207</u>, 833 F. Supp. 1366,
1381 (N.D. Ill. 1993) (intracorporate conspiracy doctrine applies

to conspiracy claims against school administrators).  But

"[s]eparate conspiracies may not be characterized as a single

grand conspiracy for a procedural advantage."  <u>Scherer</u>, 840 F.2d

at 439 (internal quotation marks omitted).  And plaintiff's

attempt to tie the custody and First Amendment issues together

into a single conspiracy is weak.  As evidence of the conspiracy,

he notes that McDonald issued a no-trespass letter against him

after Taylor regained custody, then argues that the purpose of

the letter was to ban him from attending the December 16, 2002

Board meeting where the rainbow triangles were to be discussed.

No reasonable jury could agree, however, particularly given

(i) plaintiff's admission that the no-trespass letter was issued

because of the court order barring him from contact with his son

and (ii) the fact that plaintiff was not prevented from attending

or participating in the December 16, 2002 Board meeting.[27]

Third, although the conspiracy purportedly began in August

2002 to retaliate against plaintiff for protesting the display of

the rainbow triangles (Sec. Am. Compl. ¶ 21), plaintiff did not

even speak out about the rainbow triangles until October 2002.

---

[27]/  Plaintiff is also wrong on the law on several points.  For example, he argues that to succeed on his conspiracy claim, he need not show that any of the District 227 defendants committed an overt act in furtherance of the conspiracy. Rather, he contends that it would be enough to show that his ex-wife did something unlawful.  (Pl.'s Resp. at 7.)  This argument ignores the fact that he claims that the purpose of the conspiracy (or at least one purpose) was to retaliate against him for exercising his First Amendment rights.  As a matter of law, his ex-wife could not unlawfully retaliate against him because she is not a state actor.  So if she is the only one who committed any acts in furtherance of the conspiracy, there was no conspiracy to retaliate against him for exercising his First Amendment rights.

It is therefore difficult to understand how defendants could have agreed to retaliate against plaintiff for exercising his First Amendment rights when the agreement supposedly pre-dated plaintiff's speech.

Fourth, and most importantly, plaintiff's conspiracy claim is viable only if his Constitutional rights were violated as a result of the conspiracy.[28]  <u>Goldschmidt</u>, 686 F.2d at 585 (actual denial of civil rights required for § 1983 conspiracy claim). Here, as explained earlier, plaintiff's only viable First Amendment claim is his claim against McDonald and the Board relating to the assembly on April 7, 2005.  Even if he prevails on that claim, we fail to see how being ejected from the April 7th assembly for views he expressed about the teachers' union relates to the alleged conspiracy to deprive him of custody and retaliate against him for protesting the rainbow triangles, particularly since the custody and rainbow triangle issues occurred several years earlier.[29]  Accordingly, because the conspiracy claim is not based on any actionable violation of his

---

[28]/  Even if plaintiff's conspiracy claim arises under common law, the claim is premised on a First Amendment violation, so he must prove a First Amendment violation.  <u>See</u> <u>Adcock</u>, 645 N.E.2d at 894 (To succeed on a common law conspiracy claim, he must demonstrate that one of conspirators "committed an overt act in furtherance of the conspiracy," and that such "act was tortious or unlawful in character.").

[29]/  Plaintiff does not claim he was ejected from the assembly for protesting the rainbow triangles – nor could he credibly do so.  By his own characterization of the relevant events, he participated in several of the earlier assemblies that day and was not ejected until he criticized the union.

Constitutional rights, the claim fails as a matter of law.  See
Rojicek v. Cmty. Consol. Sch. Dist. 15, 888 F. Supp. 878, 886
(N.D. Ill. 1995) (gist of § 1983 conspiracy claim is deprivation
of constitutional right, not the conspiracy itself); Adcock, 645
N.E.2d at 894 (common law conspiracy claim only actionable if
tortious or unlawful act was committed in furtherance of
conspiracy).[30]

For all of these reasons, there is no genuine issue of fact
as to the existence of an actionable conspiracy.[31]  The court
therefore grants summary judgment in favor of the District 227
defendants on the conspiracy claim (except Hunigan, who was not
named as a conspirator).

### 3.   Intentional Infliction of Emotional Distress

Plaintiff's claim for intentional inflection of emotional
distress likewise fails as a matter of law.  Here, although
plaintiff contends that each of the District 227 defendants is
liable for this intentional tort, we agree with defendants that
much of his claim is time barred and, in any event, the conduct

---

[30]/  As noted earlier, the alleged tortious or otherwise unlawful act is
that defendants retaliated against him for exercising his First Amendment rights.

[31]/  Although Taylor has not moved for summary judgment, given the lack of
evidence that any of the District defendants conspired with her, the conspiracy
claim against her fails as well.

he complains of is not outrageous enough to support a verdict in his favor.[32]

As an initial matter, to the extent plaintiff's tort claim depends on conduct that occurred before March 17, 2004 (e.g., conduct relating to the DCFS report and rainbow triangle protest), his claim is time barred. Under 745 ILCS 10/8-101 of the Illinois Local Governmental and Local Governmental Employees Tort Immunity Act ("Tort Immunity Act"), "[n]o civil action may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." After voluntarily dismissing his original complaint on March 9, 2004, plaintiff sought and obtained leave to reinstate his claim on March 16, 2005. Therefore, under the applicable one-year statute of limitations, to the extent plaintiff's tort claim is based on conduct that occurred before March 17, 2004, the claim is time barred.[33]

---

[32]/ We therefore need not address defendants' argument that they are also immune from liability under 745 ILCS 10/2-201.

[33]/ Although Taylor has not moved for summary judgment, plaintiff's intentional infliction of emotional distress claim against her appears to be time barred as well. Based on the record before us, plaintiff complains only of Taylor's conduct relating to the child abuse charges and custody issues, which occurred in 2002. So even under the two year statute of limitations applicable to Taylor (to whom the Tort Immunity Act does not apply), plaintiff's complaint filed on March 17, 2005 would be untimely. See Feltmeier v. Feltmeier, 798 N.E.2d 75, 85 (Ill. 2003)(2 year statute of limitations for personal injury cases set forth in 735 ILCS 5/13-202 governs intentional infliction of emotional distress claims).

None of plaintiff's arguments to the contrary have merit.
He first asserts that he dismissed his original case on March 17,
2004 — not March 9, 2004 — so the Illinois saving statute, 735
ILCS 5/13-217, saves his claim.  Plaintiff is wrong for two
reasons.  For one thing, he dismissed his original case on March
9, 2004, the date he filed his notice of voluntary dismissal
pursuant to Federal Rule of Civil Procedure 41(a).  It makes no
difference that the court entered a minute order on March 17,
2004 stating that the case was voluntarily dismissed.  Plaintiff
had an absolute right to voluntarily dismiss his case without an
order of court, so the dismissal was effective on the date he
filed his notice.  <u>See</u> Fed. R. Civ. P. 41(a) (providing for
voluntary dismissal without order of court where opponent has not
filed answer); <u>Marques v. Fed. Reserve Bank of Chicago</u>, 286 F.3d
1014, 1017 (7th Cir. 2002) (right to voluntarily dismissal is
absolute).  Additionally, plaintiff's argument is based on an
erroneous application of 735 ILCS 5/13-217.  He contends that
under the saving statute, if an action is voluntarily dismissed,
a plaintiff may commence a new action within one year after
dismissal, or within the remaining period of the statute of
limitations, whichever is greater.  But a plain reading of the
statute shows that, by its express terms, its time extension does

not apply to cases that were voluntarily dismissed.[34]  735 ILCS
5/13-217 ("No action which is voluntarily dismissed by the
plaintiff . . . may be filed where the time for commencing the
action has expired).

Plaintiff next contends that the one-year statute of
limitations set forth in 10/8-201 of the Tort Immunity Act does
not apply because 10/8-101 applies only if the employee qualifies
for immunity under 745 ILCS 10/2-201.  This argument lacks any
legal support and ignores the plain language of 10/8-101, so we
reject it.

Plaintiff also argues that because the Tort Immunity Act
does not bar actions for constitutional violations, Birkett v.
City of Chicago, 758 N.E.2d 25, 30 (Ill App. Ct. 2001), his tort
claim is not barred to the extent that claim relates to his First
Amendment claims.  But plaintiff's reliance on Birkett is
misplaced.  Birkett in no way suggests that an otherwise stale
tort claim can survive a statute-of-limitations defense simply
because the tort claim is related to a constitutional claim.
Rather, as the Birkett court clearly explained, the Tort Immunity
Act applies only to tort actions, not to actions for
constitutional violations.  Id.  In other words, as relevant
here, although the Tort Immunity Act affects plaintiff's tort

---

[34]/  The saving statute clearly specifies the types of actions it applies
to, such as cases that a United States District Court has dismissed for lack of
jurisdiction or improper venue.  735 ILCS 5/13-217.

claim for intentional infliction of emotional distress, it has no bearing on his First Amendment claims.

Finally, plaintiff contends that none of his tort claim is time barred because the continuing violation rule applies. We disagree. Under the continuing violation rule, "where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." Feltmeier v. Feltmeier, 798 N.E.2d 75, 85 (Ill. 2003) (citation and internal quotation marks omitted). But under the rule, a defendant's conduct may be viewed as a continuous whole for statute of limitations purposes only where "the acts are continuous, by the same actor, and of a similar nature . . . ." Pavlik v. Kornhaber, 761 N.E.2d 175, 187 (Ill. App. Ct. 2001) (emphasis added). Here, plaintiff attempts to invoke the continuing violation rule by improperly lumping different acts by different actors at varying time periods. The individual defendants' conduct cannot be considered collectively simply because they were all associated with District 227. And plaintiff offers no argument based on consideration of each defendant's conduct individually to support application of the continuing violation rule.

Accordingly, because the Tort Immunity Act's one-year statute of limitations applies, plaintiff's intentional infliction of emotional distress claim is limited to defendants'

conduct that occurred on or after March 17, 2004, namely that:
(a) plaintiff was removed from the April 7, 2005 assembly;
(b) Hunigan barred plaintiff from campus following that assembly;
and (c) plaintiff was surrounded by three squad cars when he
arrived for the April 12, 2005 PTSO meeting.[35]  To prevail on an
intentional infliction of emotional distress claim, a plaintiff
must demonstrate that: "1) the defendant's conduct was extreme
and outrageous; 2) the defendant either intended to inflict
severe emotional distress or knew that there was a high
probability that its conduct would do so; and 3) the defendant's
conduct actually caused severe emotional distress."  Welsh v.
Commonwealth Edison Co., 713 N.E.2d 679, 683 (Ill. App. Ct.
1999).  Illinois courts "essentially restrict[] the tort of
intentional infliction of emotional distress to those cases in
which defendant's conduct is so abusive and atrocious that it
would cause severe emotional distress to a person of ordinary
sensibilities."  Rudis v. Nat'l College of Ed., 548 N.E.2d 474,
477 (Ill. App. Ct. 1989).  "Whether conduct is extreme and
outrageous is judged on an objective standard based on all the
facts and circumstances of a particular case."  Doe v. Calumet
City, 641 N.E.2d 498, 507 (Ill. 1994).  "Liability clearly does
not extend to mere insults, indignities, threats, annoyances,

---

[35]/  For purposes of discussion, we assume that McDonald was responsible for
having plaintiff removed from the assembly and that the incident with the squad
cars is attributable to one of the named defendants (such as Spoolstra).

petty oppressions or trivialities." <u>Pub. Fin. Corp. v. Davis</u>, 360 N.E.2d 765, 767 (Ill. 1976). Here, none of the conduct that occurred within the limitations period was objectively "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." <u>Id.</u> (internal quotation marks and citation omitted).[36] Accordingly, none of the defendants face liability.

Finally, even if any of the defendants' conduct was actionable, plaintiff lacks evidence that the "conduct actually caused him severe emotional distress." <u>Welsh</u>, 713 N.E. 2d at 683. Infliction of emotional distress alone does not give rise to a cause of action — the emotional distress must be severe. <u>Pub. Fin. Corp.</u>, 360 N.E.2d at 767. "Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." <u>Id.</u> Here, although plaintiff presents evidence that he felt ashamed and humiliated, "[t]he law intervenes only where the distress inflicted is so severe that no

---

[36]/ Defendants' motion described three incidents that fell within the statute of limitations period – plaintiff's removal from the assembly, Hunigan banning him from campus, and an argument between McDonald and plaintiff about a meeting he had with a teacher during class time when the class was present. Plaintiff made a written complaint against McDonald to the District regarding the argument, claiming she was harassing him. We did not consider the argument, however, because the evidence shows that it occurred on April 21, 2003, (Pl.'s Resp. DSUF at ¶¶ 42-44), and thus the incident is barred by the statute of limitations. In any event, even if McDonald's conduct toward plaintiff on April 23, 2003 was not time barred, her conduct cannot support an intentional infliction of emotional distress claim because it was not objectively "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency[.]" <u>Pub. Fin. Corp.</u>, 360 N.E.2d at 767.

reasonable man could be expected to endure it." Id. (internal
quotation marks omitted). Plaintiff's evidence falls far short
of that bar. Indeed, plaintiff made no effort to argue that the
distress he suffered was so intense and severe that a reasonable
person could not be expected to endure it.

Because the conduct at issue was not sufficiently outrageous
and the distress plaintiff suffered was not sufficiently severe
to be actionable, no reasonable jury could return a verdict in
plaintiff's favor on his intentional infliction of emotion
distress claim. Accordingly, we grant summary judgment for
defendants on this claim.

III. **CONCLUSION**

For the reasons explained above, defendants' motion to
strike is granted in part and denied in part and DSUF ¶¶ 3-7, 21,
23-28, 34, 35, 38, 40, 45, 48 and 49 are deemed admitted.
Defendants' motion for summary judgment is also granted in part
and denied in part. Specifically, we grant summary judgment in
favor of the District 227 defendants on plaintiff's conspiracy[37]
and intentional infliction of emotional distress claims.
Additionally, we grant summary judgment in favor of defendants
Baecher, Burnette, Hunigan, Knutson, Kolosh, Spoolstra, Tandy and
Williamson on plaintiff's First Amendment claim. Only

---

[37] As noted earlier, Hunigan was not named as a defendant to the
conspiracy claim.

plaintiff's First Amendment claim against defendant McDonald and the Board arising out of the April 7, 2005 assembly survives summary judgment.[38]

DATED:    April 27, 2007


ENTER:    _____
          John F. Grady, United States District Judge

---

[38]/    Additionally, given the deficiencies in plaintiff's claims against Taylor as explained in footnotes 13, 31 and 33, in the accompanying minute order, we are ordering plaintiff to show cause why we should not sua sponte grant summary judgment in Taylor's favor and against plaintiff.  Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [he] had to come forward with all [his] evidence.").